OPINION AND ORDER
 

 AIKEN, District Judge.
 

 Plaintiff Edge Wireless, LLC filed suit against defendant U.S. Cellular Corporation, alleging trademark infringement arising from defendant’s introduction of its new wireless data service “easyedgeSM.” Plaintiff alleges that defendant’s ea-syedgeSM mark looks, sounds, and functions like plaintiffs house mark,
 
 edgewiREless
 
 ®, and other related marks. Plaintiff moves for a preliminary injunction enjoining defendant from using the easyedge SM mark in connection with its wireless services.
 

 On December 8, 2003, the court received testimony and heard oral argument on plaintiffs motion. On December 16, 2003, at the court’s suggestion, the parties participated in a judicial settlement conference with Magistrate Judge Coffin in an effort to resolve this matter. Their efforts were not successful, but the parties agreed to an accelerated trial date. On December 18, 2003, the court held a status conference and scheduled trial to commence on March 2, 2004. While the new trial date mitigates the need for preliminary relief to some degree, the court issues the following ruling to preserve the status quo pending trial.
 

 I. BACKGROUND
 

 Plaintiff is an Oregon wireless telecommunications company founded in 1999 and headquartered in Bend, Oregon. Plaintiff provides wireless telecommunications services in rural areas of southern Oregon, Central and Eastern Idaho, Northwest Wyoming, and Northern California.
 

 On October 2, 2000, plaintiff applied to register the
 
 edgewiREbEss
 
 ® house mark,
 
 *MCCCLXX
 
 and on June 4, 2002, the mark was federally registered. Since January 2001, plaintiff has used the
 
 edgewiRELESs®
 
 logo in connection with its business. Plaintiff offers several different rate plans, including NationalEdge, WesternEdge, LocalEdge, SharedEdge, and AccessEdge.
 
 [1]
 

 Plaintiff maintains that it has spent millions of dollars to begin and expand its business, including $6 million for media promotions. Plaintiff also has established a physical presence by opening 16 retail stores and approximately 43 independent dealer outlets to sell its services and products.
 

 Defendant U.S. Cellular has been in the telecommunications business since 1985. Defendant provides wireless services to most of the state of Oregon, southern Washington, northern California, and a portion of Idaho, in addition to several other markets nationwide. Thus, since 2001, plaintiff and defendant have provided wireless voice services in the same markets in southern Oregon, northern California, and central and eastern Idaho.
 

 In May 1999, defendant introduced its U.S. Cellular house mark and star logo.
 
 See, e.g.,
 
 Defendant’s Memorandum in Opposition to Motion for Preliminary Injunction, p. 2. Since that time, defendant has spent over $375 million in promoting the mark to insure that it is easily and immediately recognized by consumers. Defendant maintains that it is critical that each of its services and products are identified with its house mark and star logo.
 

 Both parties are in the process of updating their wireless networks and rolling out wireless data services such as polyphonic ringtones, email capability, music downloads, games, web-browsing, and the ability to send and receive photographs.
 

 On June 28, 2002, plaintiff announced the expansion and enhancement of its network to provide advanced voice and data wireless services called “edge + ” services. Plaintiff claims it has spent millions of dollars on this venture over the last 18 months and intends to introduce the new service sometime late this year or early next year. The new rate plans for the advanced services will be called National-Edge + and LocalEdge+ . Likewise, in December 2002, defendant decided to upgrade its networks and offer an optional data feature available to its wireless voice customers, later branded as easyedge SM. Defendant claims it has invested $11.5 million the easyedge SM mark.
 

 On September 22, 2003, defendant formally introduced the easyedgeSM mark and logo. Defendant first made ea-syedge31'1 available in Illinois, Tennessee, Iowa, and Wisconsin. Defendant plans to introduce easyedgeSM in the markets in which it directly competes with plaintiff by the spring of 2004. Thus, defendant’s introduction of its easyedgeSM expanded wireless service may coincide with plaintiffs introduction of its expanded wireless “ + ” services.
 

 II. DISCUSSION
 

 Plaintiff moves for a preliminary injunction prohibiting defendant from using the easyedgeSM mark in connection with its wireless services. Plaintiff asserts that since 1999, it has spent tens of millions of dollars in its rural markets to build its business and achieve customer recognition and commercial success. Plaintiff alleges that defendant — by its use of the ea-syedge SM mark and logo — is attempting to usurp the
 
 edgewiRELESs
 
 ® service marks
 
 *MCCCLXXI
 
 and confuse current and potential customers about the affiliation and source of the easyedge SM service. Specifically, plaintiff requests that the court issue a preliminary injunction enjoining defendant from advertising, marketing, or selling easyedgeSM services in order to maintain the status quo and prevent irreparable harm to plaintiffs goodwill and reputation.
 

 Defendant responds that plaintiff cannot establish a likelihood of confusion, because easyedge SM is always identified as a U.S. Cellular service and consumers will associate easyedgeSM exclusively with defendant. Further, defendant argues that it would suffer severe and irreparable harm if prohibited from using the easyedge SM mark.
 

 A. Standard for Preliminary Injunction
 

 “A preliminary injunction is not a preliminary adjudication on the merits, but a device for preserving the status quo and preventing the irreparable loss of rights before judgment.”
 
 Textile Unlimited, Inc. v. A..BMH and Co., Inc.,
 
 240 F.3d 781, 786 (9th Cir.2001). Accordingly, the party seeking a temporary restraining order or preliminary injunction must show either “(1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips sharply in its favor.”
 
 Big Country Foods v. Bd. of Educ. of Anchorage School Dist.,
 
 868 F.2d 1085, 1088 (9th Cir.1989).
 

 While stated as alternatives, “[tjhese formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases.”
 
 Id.
 
 In cases alleging trademark infringement, irreparable injury generally may be presumed upon a showing of likelihood of consumer confusion.
 
 See Brookfield Communications, Inc. v. West Coast Entertainment Corp.,
 
 174 F.3d 1036, 1066 (9th Cir.1999).
 

 B. Likelihood of Success on the Merits
 

 Plaintiff alleges two claims of trademark infringement in violation of §§32 and 43(a) of the Lanham Act. 15 U.S.C. §§ 1114 and 1125(a). “The Lan-ham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.”
 
 Park ‘N Fly, Inc. v. Dollar Park and Fly, Inc.,
 
 469 U.S. 189, 198, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). To establish a claim for trademark infringement under the Lanham Act, plaintiff must establish that defendant “is using a mark confusingly similar to a valid, protectable trademark” of plaintiffs.
 
 Brookfield,
 
 174 F.3d at 1046. “The core element of trademark infringement is whether the similarity of the marks is likely to confuse customers about the source of the products.”
 
 Interstellar Starship Servs. Ltd. v. Epix, Inc.,
 
 304 F.3d 936, 941 (9th Cir.2002).
 

 Defendant does not contest that plaintiff possesses valid and protectable marks; rather, defendant argues that there is no similarity between the marks that would cause consumer confusion. Defendant maintains that the easyedge SM mark — as it appears in the marketplace — is always identified with the U.S. Cellular house mark and star logo, thus negating the probability of consumer confusion. Therefore, the sole issue is whether defendant’s use of the easyedge SM mark is likely to create consumer confusion as to the source or affiliation of the easyedgeSM service.
 

 “The test for likelihood of confusion is whether a ‘reasonably prudent consumer’ in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks.”
 
 *MCCCLXXII
 

 Dreamwerks Production Group, Inc. v. SKG Studio,
 
 142 F.3d 1127, 1129 (9th Cir.1998). To evaluate the likelihood of confusion, courts generally apply the so-called
 
 Sleekcraft
 
 factors.
 
 See AMF Inc. v. Sleek-craft Boats,
 
 599 F.2d 341 (9th Cir.1979). These factors include: 1) the similarity of the marks; 2) the relatedness or proximity of the two companies’ products or services; 3) the strength of the registered mark; 4) the marketing channels used; 5) the degree of care likely to be exercised by a consumer in selecting goods; 6) the accused infringers’ intent in selecting its mark; 7) evidence of actual confusion; and 8) the likelihood of expansion in product lines.
 
 Sleekcraft,
 
 599 F.2d at 348-49.
 
 [2]
 

 The
 
 Sleekcraft
 
 factors are intended to provide guidance rather than dictate a particular result, and the “relative importance of each factor is case-specific.”
 
 Brookfield,
 
 174 F.3d at 1054;
 
 see Entrepreneur Media, Inc. v. Smith,
 
 279 F.3d 1135, 1140-41 (9th Cir.2002). While “the
 
 Sleekcraft
 
 test plays an important role in the analysis of whether a likelihood of confusion exists, ‘[i]t is the totality of facts in a given case that is dispositive.’ ”
 
 Entrepreneur Media,
 
 279 F.3d at 1140 (quoting
 
 Rodeo Collection, Ltd. v. West Seventh,
 
 812 F.2d 1215, 1217 (9th Cir.1987)). For this reason, “it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors,” though factors such as the similarity of the marks and whether the parties directly compete are always important.
 
 Brookfield,
 
 174 F.3d at 1054. Finally, a finding of a likelihood of confusion requires that such confusion be probable and “not simply a possibility.”
 
 Rodeo Collection,
 
 812 F.2d at 1217.
 

 With these principles in mind, I find four factors particularly relevant to the question of whether a likelihood of confusion is created by defendant’s introduction of the easyedgeSM service: the similarity of the marks, the relatedness of the services offered, the marketing channels utilized by the parties, and the degree of care exercised by consumers when choosing a wireless service.
 

 1. Similarity of Marks
 

 When determining the similarity of the marks, three axioms apply: 1) marks should be considered in their entirety and as they appear in the marketplace; 2) similarity is best adjudged by appearance, sound, and meaning; and 3) similarities weigh more heavily than differences.
 
 GoTo.com, Inc. v. Walt Disney Co.,
 
 202 F.3d 1199, 1206 (9th Cir.2000).
 

 Upon review of the submissions, I agree with plaintiff that the parties’ marks bear similarities in appearance, sound, and meaning. Both the
 
 edgewiRELESs
 
 ® and ea-syedge SM marks distinguish the term “edge” by using lower case letters in bold or different color type. Plaintiffs rate plan marks — SharedEdge, NationalEdge, LoealEdge, and AccessEdge — use “edge” as a suffix, one with lower case letters, as does defendant’s easyedgeSM mark. In particular, defendant’s easyedgeSM mark and logo is very similar to plaintiffs logo for its AccessEdge service.
 
 See
 
 Plaintiffs Memorandum in Support of Motion for Preliminary Injunction, p. 11. Further,
 
 *MCCCLXXIII
 
 defendant also uses a color scheme similar to that used by plaintiff for easyedgeSM brochures and advertisements.
 
 See generally
 
 plaintiffs Hearing Exhibit Nos. 50-67. The marks are also similar in terms of sound. Defendant’s easyedge SM mark has a similar cadence when compared to plaintiffs marks, again being most similar to AccessEdge and plaintiffs other rate plan marks. Finally, the marks are similar in meaning, because they both identify wireless services, and easyedgeSM creates an impression similar to that created by
 
 ed-gewiRELESs
 
 ® marks, i.e. the cutting “edge” of technology.
 

 Defendant argues that its font and exclusive use of lower case letters distinguishes easyedge SM from plaintiffs marks, and that the only similarity is the use of the work “edge.” Likewise, defendant argues that the marks do not sound alike, because plaintiffs marks do not share the same alliteration of easyedge SM. Defendant argues the functions and meanings are different, because defendant emphasizes the “easy” element of easyedgeSM rather than “edge.” I do not necessarily find defendant’s argument persuasive. The marks and logo share similar fonts, words, and colors, and they sound similar or at least related. Further, the term “edge” in both parties’ marks creates similar impressions, even if defendant’s mark also gives the impression of ease.
 

 Defendant’s better argument is that plaintiff analyzes the marks in isolation rather than how they appear in the marketplace. Defendant argues that ea-syedgeSM is always displayed in conjunction with the U.S. Cellular house mark and star logo, thereby distinguishing ea-syedgeSM from plaintiffs marks when viewed in their entirety. Further, defendant emphasizes that
 
 edgewiRELESs
 
 ® is most often displayed along with the distinctive and prominent AT
 
 &
 
 T Wireless mark, logo, and phrase, “A Member of the AT
 
 &
 
 T Wireless Network.”
 
 See Universal Money Centers, Inc. v. American Telephone & Telegraph Co., 22
 
 F.3d 1527, 1531 (10th Cir.1994) (defendant’s mark as a whole was not “confusingly similar” to plaintiffs mark in light of “distinctive” house mark “prominently displayed”);
 
 EA Engineering v. Environmental Audit, Inc.,
 
 703 F.Supp. 853, 857-58 (C.D.Cal.1989) (defendant’s use of “EA” with full corporate name rendered similarity with plaintiffs mark minimal). Therefore, defendant argues that the use of these well-known and easily-identified house marks dispels any possibility, much less probability, of confusion.
 
 See generally,
 
 defendant’s Hearing Exhibit No. 101; Declaration of Julie A. Brown, Exhibit E (transcripts from video and radio advertisements identifying easyedgeSM as a U.S. Cellular product).
 

 Plaintiff responds that it is merely a member of the AT & T wireless network, and that the AT & T phrase and logo are intended to inform consumers that they can travel outside plaintiffs service areas and still have compatible service.
 
 [3]
 
 Plaintiff emphasizes that it does not mention the AT & T network connection in radio advertisements and does not display the AT & T logo on its storefront signs or accessories.
 

 Plaintiffs relationship with AT & T Wireless notwithstanding, I agree with defendant that the similarities and the
 
 *MCCCLXXIV
 
 likelihood of confusion between the marks lessen considerably when viewed in their entirety as they usually appear in the marketplace.
 
 See Cohn v. Petsmart,
 
 281 F.3d 837, 842 (9th Cir.2002) (no confusion where distinctive house mark displayed and accused mark used as “tagline”);
 
 Walter v. Mattel, Inc.,
 
 210 F.3d 1108, 1109 (9th Cir.2000) (no confusion in light of dissimilarity between products and defendant prominently displayed house mark). This is especially true when consumers of wireless voice and data services generally cannot purchase the service without entering into a contract with the service provider. Thus, a consumer who purchases the easyedgeSM service would understand that its service provider is defendant and not plaintiff.
 

 Nevertheless, even if defendant’s house mark makes clear that easyedgeSM is a product of U.S. Cellular, it does not necessary dispel confusion that the easyedge SM service is somehow affiliated with
 
 edgew-iRELESS
 
 ®.
 
 See Rodeo Collection,
 
 812 F.2d at 1217 (a likelihood of confusion also exists “when the consumer would be likely to assume that the identified services are in some way associated with another service-provider.”). Given the similarities, defendant’s use of the easyedge SM mark may nevertheless cause confusion for potential consumers, because they may associate ea-syedge81'1 with edgewiRELESS®. In that case, defendant could capitalize on plaintiffs goodwill by attracting consumers who became interested in the easyedge SM service due to their familiarity with the
 
 ed-gewiRELESS
 
 ® mark and related services.
 

 Thus, while I agree that the use of defendant’s house mark and star logo lessens the similarities between the marks, it does not negate the fact that the many similarities between the easyedgeSM and
 
 edgewiRELESS®
 
 marks in terms of sound, meaning, and function weigh more heavily than the differences.
 

 2. Relatedness and Proximity of Service of Services
 

 “Where goods are related or complementary, the danger of consumer confusion is heightened.”
 
 E. & J. Gallo Winery v. Gallo Cattle Co.,
 
 967 F.2d 1280, 1291 (9th Cir.1992). Plaintiff maintains that the voice and data service defendant introduced as easyedge SM is virtually identical to the
 
 edgewiRELESS
 
 ® advanced voice and data wireless services. Defendant responds that the services are not closely related, because the easyedge SM service is primarily an add-on feature for existing customers, while plaintiffs marks designate various calling plans. Therefore, defendants argue that the goods designated by the parties’ respective marks are not competing or comparable services.
 
 [4]
 

 Defendant’s argument reflects a far too narrow approach to this factor. Both ea-syedge SM and the
 
 edgewiRELESS®
 
 marks designate wireless voice and data telecommunication services. Thus, the services are closely related if not the same, and this factor weighs in favor of finding the probability of a likelihood of confusion.
 

 3. Marketing Channels
 

 Plaintiff alleges that it has spent $6 million on marketing and advertising since January 2001, including 15 different television advertisements aired 51,000 times in 15 markets, 29 different radio advertisements aired 100,000 times in 15 markets, 122 different newspaper ads run 3900 times in 42 newspapers, millions of bro
 
 *MCCCLXXV
 
 chures and flyers, and a website currently averaging over 2,000,000 hit per month. Plaintiff has also created promotional materials exhibiting the
 
 edgewiRELESS
 
 ® mark.
 

 Plaintiff maintains that defendant, too, promotes easyedge SM on television and radio, in newspapers, on its website, in retail stores and independent distributors, and through direct mailings. Plaintiff emphasizes that defendant has created promotional materials similar to those of
 
 ed-geWIRELESS
 
 ®, including pens, hats, notepads, coffee mugs, and T-shirts with the easyedge SM logo.
 

 Defendant admits that it promotes ea-syedge SM through a variety of media outlets, including newspapers, radio, and its web site. However, defendant argues that it primarily sells its wireless service through stores operated by U.S. Cellular or its agents, and that each store is required to have a prominent signage displaying the U.S. Cellular house mark and star logo. Given that the parties are direct competitors and both utilize the same forms of media in advertising and promoting their services, I find that the marketing channels of the parties overlap significantly. Therefore, this factor weighs in favor of finding a likelihood of confusion.
 

 E Degree of Care by Consumers
 

 It is generally assumed that consumers with expertise or who are buying expensive products or services exercise a greater degree of care when doing so and are thus less easily confused.
 
 See Brookfield,
 
 174 F.3d at 1060. I find this factor particularly relevant in light of the highly technological nature of the parties’ services.
 

 In evaluating this factor, plaintiff argues that the court should apply the “least sophisticated consumer” standard rather than the “reasonably prudent consumer” standard.
 
 See id.
 
 (citing
 
 Ford Motor Co. v. Summit Motor Prods., Inc.,
 
 930 F.2d 277, 293 (3d Cir.1991)). Plaintiff contends that the parties’ services are offered to different categories of users, and that some users will be more sophisticated than others, rendering the “least sophisticated consumer” standard more applicable.
 
 Id.
 
 Defendant responds that consumers willing to pay for the latest technological advances in wireless access will be highly sophisticated consumers who will exercise a corresponding degree of care when choosing a wireless service.
 

 In this case, I do not find the particular standard the court employs to be of great significance. Given the technologically-advanced nature of wireless data services and the fact that a typical plan costs approximately $600 per year,
 
 see
 
 Deposition of Donald F. Castleman, President and CEO of Edge Wireless, p. 95 (attached to Declaration of Steven T. Lovett), even an unsophisticated consumer will likely know the type of service being selected and the provider from whom she is purchasing it. In fact, defendant presented deposition testimony from Donald Castleman, President and CEO of Edge Wireless, that consumers exercise a great deal of care when selecting a wireless service provider, comparing plan rates and services and reading all of the relevant information from the service provider before choosing a carrier. Castleman Deposition, pp. 70-71. Therefore, a consumer is less likely to be confused when purchasing a wireless service, particularly where, as here, the services are clearly identified with the house mark or affiliated wireless network. This factor thus weighs against finding a likelihood of confusion.
 

 5. Other Factors
 

 Although afforded lesser weight, I also consider the strength of plaintiffs marks, defendant’s intent, evidence of actual confusion, and the likelihood of market expansion.
 

 
 *MCCCLXXVI
 
 Marks that are strong or distinctive receive greater protection than weaker ones.
 
 See Brookfield,
 
 174 F.3d at 1058. “Marks are often classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful.”
 
 Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery,
 
 150 F.3d 1042, 1047 (9th Cir.1998). Defendant argues that plaintiffs marks are weak and deserving of lesser protection, because “edge” merely suggests “innovative, high-tech, or technologically advanced,” i.e. “cutting edge,” and “wireless” is descriptive. While I agree that the term “wireless” is descriptive, plaintiffs edgewiRBLBSs® marks are suggestive, as defendant implicitly concedes, “and thus strong enough to warrant trademark protection — because [they] require a mental leap from the mark[s] to the [services].”
 
 Brookfield,
 
 174 F.3d at 1058.
 

 Defendant also argues that plaintiffs marks are weak because they are in a “crowded field” of similar marks in the wireless telecommunications industry, including several wireless communication companies and numerous trademark registrations with the term “edge.”
 
 See
 
 Exhibits attached to Affidavit of Wendy Riggs. However, in determining the strength of a mark, a court “must consider the specific associations that the composite mark triggers in the minds of consumers when it is used to identify [the] services” rather than mere frequency of use.
 
 Rodeo Collection,
 
 812 F.2d at 1218. Thus, I do not find that the use of “edge” by a handful of telecommunications companies renders the term common or descriptive within the telecommunications industry.
 
 [5]
 

 Finally, defendant argues that term “EDGE” — a term for Enhanced Data rates for GSM Environment — is becoming a generic term in the telecommunications industry.
 
 See
 
 Declaration of Nathanael G. Barnes, Exhibits 7-9. Regardless of whether those in the telecommunication field are familiar with the new EDGE technology, defendant does not present evidence that the term “EDGE” has become generic to consumers in the marketplace. Thus, even if
 
 edgewmELBSs®
 
 “falls within the weak side of the strength spectrum, the mark is not so flabby as to compel a finding of no likelihood of confusion” in light of the other
 
 Sleekcraft
 
 factors.
 
 Brookfield,
 
 174 F.3d at 1058.
 

 Next, I do not find significant defendant’s admitted knowledge of the
 
 edgewiREless
 
 ® mark or plaintiffs lack of evidence of actual confusion. Based on the evidence before the court at this time, I do not find it likely that defendant intended to deceive or confuse consumers when selecting the easyedgeSM mark.
 
 See Interstellar,
 
 304 F.3d at 947; Declaration of Kathryn Yolpi. Defendant has a presence in larger metropolitan markets across the country, and it defies common sense that defendant chose the mark to confuse or deceive customers in small, rural markets in southern Oregon, northern California, and eastern Idaho. At most, defendant knew of plaintiffs mark but nevertheless took a calculated risk to proceed with the easyedge SM mark. Regardless of the wisdom of this action or the sufficiency of defendant’s investigation into the uses of “edge,” it does not rise to the level of an intent to deceive or an intent to derive a benefit from plaintiffs mark or associated goodwill.
 

 
 *MCCCLXXVII
 
 Similarly, I do not find actual confusion relevant here, because defendant has yet to launch easyedgeSM in plaintiffs markets. Thus plaintiff has had little, if any, opportunity to collect information on actual confusion.
 
 Brookfield,
 
 174 F.3d at 1060. Defendant nevertheless argues that plaintiff had ample time and money to conduct its own survey and should have done so to assess the likelihood of confusion before moving for “extraordinary” injunctive relief.
 
 See Playboy Enterprises, Inc. v. Netscape Communications Corp.,
 
 55 F.Supp.2d 1070, 1084 (C.D.Cal.),
 
 aff'd,
 
 202 F.3d 278 (9th Cir.1999). However, given that defendant introduced easyedge SM in September 2003, and plaintiff filed suit and moved for preliminary injunctive relief in October 2003, I decline to presume that survey results, had they been provided, would have been unfavorable to plaintiff.
 

 Finally, I find the likelihood of expansion unimportant where, as here, the parties already compete directly in a number of markets.
 
 Brookfield,
 
 174 F.3d at 1060.
 

 In sum, upon consideration of the totality of the facts presented, I find that plaintiff raises serious questions as to whether a likelihood of confusion exists between easyedgeSM and plaintiffs protected marks. I recognize and appreciate defendant’s argument that consumers in the marketplace would not be confused by defendant’s easyedge SM mark, because plaintiff is explicitly affiliated with the AT & T Wireless network and easyedge SM is clearly identified as a product of U.S. Cellular. Further, I question whether consumers in the marketplace select wireless services based on marks, logos, and the like. Although the court must look at the marks as they appear in the marketplace, that task proves difficult when evidence is presented out of context in a federal courtroom. As aptly observed by the Seventh Circuit, review of evidence in such a vacuum is akin to wearing “figurative blinders” when comparing the similarity of the marks.
 
 AM General Corp. v. Daimler-Chrysler Corp.,
 
 311 F.3d 796, 825 (7th Cir.2002). That said, I cannot ignore the visual, auditory, and functional similarities between the marks, and for that reason I find that plaintiff meets its burden of establishing serious questions as to the merits of its claims.
 

 C. Irreparable Injury and Balance of Hardships
 

 Plaintiff relies upon the well-established presumption that injuries arising from trademark violations are irreparable, regardless of actual damages.
 
 See, e.g., Brookfield,
 
 174 F.3d at 1066. This presumption is based upon the rationale that “it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations.”
 
 Ty, Inc. v. Jones Group, Inc.,
 
 237 F.3d 891, 902 (7th Cir.2001) (quoting
 
 Abbott Labs. v. Mead Johnson & Co.,
 
 971 F.2d 6, 16 (7th Cir.1992)).
 

 It is true that a likelihood of confusion supports a presumption that plaintiff will suffer irreparable harm. Despite this presumption, however, defendant argues that the balance of hardships weighs against granting the broad injunction sought by plaintiff in the absence of any evidence of actual confusion, defendant’s intent to infringe, or actual harm. I agree.
 

 Defendant claims that it has spent over $11.1 million promoting easyedgeSM, not including public relations, regional marketing efforts, employee education, or infrastructure development, which would be lost if enjoined from using the easyedge SM mark. Defendant also asserts that an injunction prohibiting it from using ea-syedge SM would have a “crippling effect” on its business, given that many phones in its inventory display the easyedge SM mark
 
 *MCCCLXXVIII
 
 and could not be furnished to customers or practicably retrofitted. Thus, defendant claims it would suffer great costs from having inventory returned from its retail outlets. Plaintiff disputes this fact, noting that no phone in a U.S. Cellular Illinois retail store displayed the easyedgeSM mark.
 

 Regardless of this factual issue, I find that defendant would suffer severe harm from an injunction prohibiting all uses of easyedgeSM. Given the amount of resources expended by defendant in developing and promoting the easyedge SM mark, and the fact that easyedgeSM is already available in a number of other markets, such hardship is not warranted when defendant competes with plaintiff in relatively small markets and has not yet launched easyedgeSM in those markets. Although several
 
 Sleekcraft
 
 factors weigh in plaintiffs favor, they do not do so overwhelmingly. Further, the likelihood of confusion is an intensely factual question, one that ultimately cannot be determined by this court.
 

 Balancing the parties’ competing interests, plaintiffs motion is granted, in part. Defendant is enjoined from promoting or advertising the easyedge SM mark or offering the easyedge SM service in the markets in which it directly competes with plaintiff. This injunction does not affect defendant’s sale of products, such as cellular telephones, bearing the easyedgeSM mark. The circumstances under which a consumer would be able to view the mark on a U.S. Cellular phone negates the risk of confusion with plaintiff, particularly when the service is not yet offered. The court enters its ruling with the assumption that trial on the merits will proceed prior to the anticipated launch date for easyedge SM in plaintiffs markets.
 

 D. Bond
 

 Finally, the court must consider setting bond.
 
 [6]
 
 The district court is afforded wide discretion in setting the amount of the bond,
 
 Walczak v. EPL Prolong, Inc.,
 
 198 F.3d 725, 733 (9th Cir.1999), and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction.
 
 See Gorbach v. Reno,
 
 219 F.3d 1087, 1092 (9th Cir.2000).
 

 Given the limited nature of the injunction coupled with the facts that defendant does not intend to offer easyedge SM in the affected markets until spring 2004 and trial is scheduled for March 2004, the court is not inclined to require a bond at this time. If trial is continued beyond April 2004 or if defendant presents evidence of actual harm during the pendency of the proceedings, the court will revisit the issue of bond.
 

 CONCLUSION
 

 Accordingly, plaintiffs Motion for Preliminary Injunction (doc. 12) is GRANTED in part. Defendant is hereby enjoined from advertising, promoting, or offering its easyedge wireless data service in the markets in which it directly competes with plaintiff pending resolution of this action on the merits. No other action of defendant is enjoined, and plaintiffs motion is DENIED in all other respects.
 

 IT IS SO ORDERED.
 

 [1]
 

 . NationalEdge provides wireless voice service nationwide in all 50 states, WesternEdge provides service to 10 western states, Local-Edge provides local services, SharedEdge is a plan for multiple cellular phone customers, and AccessEdge is plaintiff’s prepaid wireless services plan.
 

 [2]
 

 . While identified as the
 
 Sleekcraft
 
 factors in the Ninth Circuit, courts in other circuits also apply the same or similar factors when evaluating the likelihood of confusion in trademark infringement cases.
 
 See e.g., Therma-Scan, Inc. v. Thermoscan, Inc.,
 
 295 F.3d 623, 630 (6th Cir.2002);
 
 Alliance Metals, Inc. v. Hinely Indus., Inc.,
 
 222 F.3d 895, 907 (11th Cir.2000);
 
 Nabisco, Inc. v. Warner-Lambert Co.,
 
 220 F.3d 43, 46 (2d Cir.2000);
 
 Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.,
 
 780 F.2d 1324, 1330 (8th Cir.1985);
 
 Interpace Corp. v. Lapp, Inc.,
 
 721 F.2d 460, 463 (3d Cir.1983).
 

 [3]
 

 . Given plaintiff's argument that the court should evaluate the likelihood of confusion from the perspective of the least sophisticated consumer,
 
 see infra
 
 pp. 1332-1333, it is surprising that plaintiff suggests that unsophisticated consumers will understand plaintiff is merely a member AT & T Wireless network rather than a subsidiary.
 
 See
 
 Deposition of Donald F. Castleman, President and CEO of Edge Wireless, pp. 127-28 (attached to Declaration of Steven T. Lovett).
 

 [4]
 

 . Plaintiff disputes that easyedge SM is merely an add-on service, given the upgrade in defendant’s network and the fact that consumers must purchase a new phone to receive the upgraded service. I do not find this latter argument particularly significant given the clear relatedness of the services.
 

 [5]
 

 . Plaintiff sent a cease and desist letter to Edge-Wireless, a Maryland company, and they have agreed to stop using the name “Edge-Wireless.” Affidavit of Christina Beatty-Walters, Exhibit 9. None of the other com-pañíes provides wireless services or compete in the same markets as plaintiff. Further, defendant offers no evidence that the additional trademark registrations with the term "edge” are actually in use.
 

 [6]
 

 . Federal Rule of Civil Procedure 65(c) provides that:
 

 No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to be wrongfully enjoined or restrained.